# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

GENERAC POWER SYSTEMS, INC.,

      Plaintiff,

v.

      Case No. 11-CV-1120-JPS

KOHLER COMPANY and
TOTAL ENERGY SYSTEMS, LLC,

      Defendants.

      ORDER

   The Plaintiff, Generac Power Systems, Inc. ("Generac"), filed this action on December 9, 2011, alleging that Defendant Kohler Company ("Kohler") infringed upon Generac's patent over a "System Controller and Method for Monitoring and Controlling a Plurality of Generator Sets" (U.S. Patent No. 6,653,821 B2 (the '821 patent)). (Compl.). On May 7, 2012, Generac filed an Amended Complaint, adding Total Energy Systems, LLC ("TES"), as a defendant. (Am. Compl. ¶ 4).

   After receiving a short extension of time, Generac and Kohler both filed cross-motions for summary judgment on September 12, 2012. (Docket #'s 38, 40, 48). The parties have now fully briefed those motions, and the matter is ripe for decision. (Docket #'s 41, 53, 62, 64, 72, 83, 87, 93).

1.  BACKGROUND

   Before turning to its substantive discussion of the dispute at hand and the controlling law, the Court will provide some factual background regarding the parties and products that form the foundation of this litigation.

   Generac is a Wisconsin-based company in the business of manufacturing generator equipment; in connection with that business, Generac secured the '821 patent at issue in this case. (KPFF ¶¶ 1, 8, 9).

Generac initially applied for the '821 patent on June 15, 2001. (KPFF ¶ 20). The Patent and Trade Office's ("PTO") examiners rejected each claim therein, citing U.S. Patent Nos. 5,734,255 (the "Thompson patent") as anticipatory prior art. (KPFF ¶ 23). That rejection was not final, though, and Generac responded to it by alleging that the Thompson patent differed from the '821 patent insofar as the Thompson patent "does not show or suggest a user interface that allows a remote user to select a generator set; to set values for various predetermined operating parameters of the selected generator set; and to transmit those user selected values to the generator set over the network," and further added that the Thompson patent "merely allows remote users to monitor various parameters." (KPFF ¶¶ 24–25; Stomma Resp. Letter to PTO (Docket #49, Ex. 44) at 668, 669).

The PTO examiners eventually reversed course, withdrawing their objections to the '821 patent on the basis of the Thompson patent and ultimately granting[1] Generac the '821 patent, consisting of twenty-four separate claims. (KPFF ¶¶ 9, 27, 31). In reaching their decision to grant the '821 patent, the PTO examiners stated their rationale for doing so as follows:

> The prior art of record fails to teach, disclose, or suggest, either alone or in combination [a] controller for controlling generator sets connectable to a load, each generator set having the ability to be started and stopped and including a generator communications link for connecting the generator set to a network, an engine, and a generator driving by the engine which generates

---

[1]After removing their objections based on the Thompson patent, but prior to ultimately granting the '821 patent, the PTO examiners objected to a number of claims in the '821 patent on the basis of two separate patents that are not relevant to this case; Generac amended several of its claims, added new claims, and responded to the PTO examiners' new objections before the examiners finally granted the '821 patent. (KPFF ¶¶ 28–30).

AC power, comprising: a user interface for allowing a user to select each of the plurality of generator sets and to set values for various predetermined operating parameters of each of the generator sets; and a communications link [connectable] to the network for transmitting the user set values of the predetermined operating parameters to each selected generator set.

(KPFF ¶ 31).

After the '821 patent was granted, Generac released the Modular Power Systems ("MPS") product, a generator system that takes advantage of the processes described in the '821 patent. (GPFF ¶ 25). Distilled to the simplest form possible, Generac's MPS is a generator system that is part of a network through which operational values may be transmitted after being configured through a user interface. (GPFF ¶¶ 20–21).[2]

Needless to say (otherwise, why would the Court be entertaining this suit), Kohler developed a very similar system, known as the Master Control Panel 3000 ("MCP 3000") and Decision-Maker Paralleling System ("DPS"), both of which were allegedly used, sold or offered for sale by TES. (GPFF ¶¶ 35–37; Compl. ¶¶ 18–20).

Generac then filed this suit, ultimately asserting that the DPS system infringes upon Claim 19 and Claim 23 of the '821 patent. (Compl.; KPFF ¶ 9).

2.      DISCUSSION

Turning now to its substantive discussion, the Court will first construe the relevant terms in Claim 19 and Claim 23 of Generac's '821 patent. After

---

[2]Kohler disputes Generac's proposed findings of fact that are cited in this paragraph as irrelevant and immaterial (*see* Kohler's Resp. to GPFF ¶¶ 20, 21, 25). The Court discusses these facts solely to provide narrative background, and does not view them as material. Therefore, the Court need not resolve the dispute over these facts at this juncture.

doing so, the Court will employ the construction in addressing the parties'
substantive arguments on summary judgment. In doing so, the Court will
determine whether the patent is, in fact, valid (as opposed to void as a result
of anticipation or obviousness); if the Court decides that the patent is valid,
only then must it determine whether Kohler or TES infringed upon it.

### 2.1    Claim Construction

The Court must construe two separate portions of the '821 patent:
Claim 19 and Claim 23. (*See* KPFF ¶ 9). While the two claims share much in
common, the Court will construe them separately, so that the terms of each,
as determined by the Court, are as clear as possible. Furthermore, the parties
disagree over whether patent '821 requires the absence of switchgear; the
Court will examine that dispute after construing Claim 19 and Claim 23.

Typically, claim construction is a question of law for the Court, and
therefore disputes over claim construction do not prevent summary
judgment. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir.
1995) ("We therefore…hold that in a case tried to a jury, the court has the
power and obligation to construe as a matter of law the meaning of language
used in the patent claim."). Claim construction often involves one of two
separate scenarios: either it involves "little more than the application of the
widely accepted meaning of commonly understood words"; or, it involves
the "examination of terms that have a particular meaning in a field of art.
*Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005). In applying widely
accepted meanings under the first scenario, the Court may look to general
purpose dictionaries to determine those meanings. *Id.* On the other hand, in
the second scenario, the Court should look to a broader spectrum of evidence
in order to give the claims their ordinary and customary meaning, as a

person of ordinary skill in the art would have applied to them at the time the invention was made. *Id.*, at 1313. To determine that meaning, the Court should begin with the intrinsic evidence, such as the language of the claim, the remainder of the patent and its specification, and the prosecution history; it is only if the intrinsic evidence is not sufficient to resolve all ambiguities that the Court may look to extrinsic evidence, such as dictionaries, expert witnesses and case law. *Id.*, at 1314, 1317, 1324; *see also Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1370 (Fed. Cir. 2005); *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004); *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

### 2.1.1   Claim 19

The specific terms of Claim 19, as approved by the PTO examiners, is as follows:

> A method of managing the distribution of electrical power, comprising the steps of:
>> interconnecting a plurality of generator sets to a load and to a network, each generator set having the ability to be started and stopped;
>> selecting each generator set and setting various predetermined operating parameters for each selected generator set; and
>> transmitting the settings of the predetermined operating parameters over the network to each selected generator set.

(United States Patent No. 6,653,821 (Nov. 25, 2003) (Docket #43, Ex. 1), at 14:43–14:50).

The parties subdivide Claim 19 into three separate process elements for the purpose of their discussion; the Court will address each of those process elements separately.

### 2.1.1.1   First Process Element of Claim 19

The first process element of Claim 19 provides for "interconnecting a plurality of generator sets to a load and to a network, each generator set having the ability to be started and stopped." (U.S. Patent No. 6,653,821, at 14:44-14:46). The parties generally agree that this element involves the interconnection of generator sets to both a load and to a network (though, as described further below, they disagree as to the meaning of several of the terms just used, and so disagree over the substantive meaning of this portion of the process element). (*See* KPFF ¶ 33, and Generac's Resp. to KPFF ¶ 33). They also agree that the phrase "[e]ach generator set having the ability to be started and stopped" is self-explanatory. (*See* KPFF ¶ 35, and Generac's Resp. to KPFF ¶ 35).

Despite those general areas of agreement, though, the parties substantially disagree over the substance of this process element. To begin, the parties fail to specify whether they agree to the meaning of the term "plurality," therefore, the Court will define that term for the sake of clarity. Furthermore, the parties specifically disagree over the meaning of the following terms: "generator set"; "network"; and "load." (Kohler Br. in Supp. (Docket #41), at 10; Generac Resp. (Docket #62), at 8–11; Kohler Reply (Docket #87), at 4–6). The Court now turns to its construction of each of the disputed terms.

#### 2.1.1.1.1   "Plurality"

The parties have not asserted that the term "plurality" is a term of art, and the term is widely accepted as meaning "the fact or condition of denoting, comprising, or consisting of more than one." OXFORD ENGLISH DICTIONARY, Online (September 2012).

Therefore, the Court construes the term "plurality," as it is used in Claim 19, to mean "more than one."

### 2.1.1.1.2  "Generator Set"

Kohler argues that the term "generator set" should be construed to be synonymous with the term "generator" standing alone, which Kohler asserts is standard in the industry. (Kohler Reply at 4–5). Generac argues that the term "generator set," should in fact encompass more: specifically, "an engine, a generator control, and a communications link," as the term "generator set" is defined in the '821 patent specification. (Generac Resp. at 8).

The Court agrees with Generac. Before looking to outside evidence, such as outside definitions and expert witnesses, the Court should first look to the evidence intrinsic to the '821 patent, including its specification. *See, e.g.*, *Johnson*, 415 F.3d at 1314, 1317, 1324; *Vitronics Corp.*, 90 F.3d at 1582. Here, the '821 patent discusses the terms "generator" and "generator set" as though they are distinct from one another:

> Each generator set has the ability to be started and stopped and includes a generator connectable to a load. The generator generates AC power having a magnitude and a power factor, an AC voltage having a magnitude and a frequency, and an AC current having a magnitude and a frequency. Each generator also includes an engine, a generator control and a generator communications link. An engine is operatively connected to a generator for driving the generator. A generator control is operatively connected to the engine for controlling operation thereof and is operatively connected to the generator for controlling the AC generated thereby. The generator communications link connects the generator control to a network. A user interface allows a user to select a generator set and set values for various predetermined operating parameters of the selected generator set.

(U.S. Patent No. 6,653,821, at 2:57–3:5). The patent language specifies that "[e]ach generator set…includes a generator connectable to a load." (U.S. Patent No. 2:57–2:58). That generator, in turn, "includes an engine, a generator control and a generator communications link." (U.S. Patent No. 6,653,821, at 2:62–2:63). Thus, by the very terms of the '821 patent, the Court is constrained to conclude that the term "generator set" includes more than a generator alone.

Indeed, as urged by Generac, the Court must conclude that the term "generator set" includes an engine, a generator control, and a communications link.

### 2.1.1.1.3 "Network"

As to the term "network," Kohler argues that it is a term of art meaning "a communication system for the transmission of information." (Kohler Br. in Supp. at 10). Generac, on the other hand, argues that the term "should be interpreted by its plain and ordinary meaning," specifically "a digital network connecting generator sets such that they can communicate over the network and be individually addressed." (Generac Resp. at 9).[3]

As a preliminary matter, the Court agrees with Kohler that the term "network" is a term of art, as used by the '821 patent. Therefore, the Court will look first to the patent to determine whether the term "network" is

---

[3] Generac's position on this term is somewhat perplexing, urging the Court to adopt the "plain and ordinary meaning" of a nondescript term like "network," while simultaneously providing an extremely detailed definition thereof. A true plain and ordinary meaning of the term "network" would likely be understood by members of the general public to be nothing more than that suggested by Kohler—a communication system for the transmission of information.

defined therein. *See, e.g.*, *Johnson*, 415 F.3d at 1314, 1317, 1324; *Vitronics Corp.*, 90 F.3d at 1582.

Both parties attempt to bolster their positions by identifying patent language stating that "it is contemplated that network system 10 include a network controller 170 which is operatively connected to a communication network 172 such as a telephone network, a computer network, the internet, or a combination for communication thereon." (*See* KPFF ¶ 44 and Generac Resp. to KPFF ¶ 44 (both citing U.S. Patent 6,653,821, at 11:41–11:43)). That language clearly identifies "communication network" as including items such as "a telephone network, a computer network, the internet, or a combination for communication thereon." (U.S. Patent 6,653,821, at 11:39–11:43).

Thus, given that language and the fact that the first process element of Claim 19 involves "interconnecting" generators to a network, the Court determines that the term "network," as used in the patent, contemplates—at the very least—a communication system for the transmission of information, as suggested by Kohler.

But, the Court cannot take the extra step, as requested by Generac, to define "network" with the vastly narrowing modifiers of being digital, connecting only generator sets, and enabling individual addressing. To begin this analysis with the first proposed modifier, "digital," the Court notes that there is nothing in the patent language that would specify that the network must be digital. Indeed, the examples of a "communication network" include a "telephone network," which may be either analog or digital. *See, e.g.*, ANDREW WHEEN, DOT-DASH TO DOT.COM: HOW MODERN TELE-COMMUNICATIONS EVOLVED FROM THE TELEGRAPH TO THE INTERNET 49–80

(2011); In the Matter of Amendment of Part 68 of the Commission's Rules § 68.314, 12 F.C.C.R. 19281, 19296 (Feb. 29, 1996) (discussing terminal equipment and protective circuitry interconnected with an analog telephone network). Therefore, the term "network" cannot be limited to solely digital networks.

Turning next to whether the term "network" must be limited to a connection between generator sets, the Court again determines that such narrowing modifier should not apply. The patent language describes a "network system 10" allowing "a single user to monitor several power generation systems 12 from a single locale and to control operation of these power generation systems 12...[,] to view the current operating conditions of each of the power generation systems 12, as well as, configure system controllers 14 from the remote locale" and to "obtain detailed information from individual generators 20*a* and 20*b* from the remote locale." (U.S. Patent No. 6,653,821, at 11:52–11:60). While that description contemplates the interconnection of generators, it also contemplates interconnection of those generators to system controllers and some form of display that would allow a user to "view" and "obtain" information from each of the generators. (U.S. Patent No. 6,653,821 at 11:52–11:60). Thus, with the understanding that the patent calls for the interconnection of more than the generators alone across a network, the Court cannot apply Generac's proposed limiting modifier.

The Court does agree with Generac, though, that "network" should be more limited than Kohler suggests; thus, the Court concludes that the term "network" mean a communication system for the transmission of information (be it digital or analog, and including telephone, computer, internet, or related) across which travels information that may be

Page 10 of 44

individually addressed to generators or devices intended for the monitoring and control of those generators. This definition does not apply the unduly restrictive requirement that a "network" be digital or connect only generator sets; it does, however, limit a "network" being a communication system over which information relevant to the control and function of the generators is shared. Without this limitation, the term "network" would essentially be meaningless, a plurality of generator sets to *any* network, regardless of whether the controls could be sent over the network; that is, without some meaningful limitation, the simple connection of a generator to the internet would seem to satisfy the "network" connection requirement.

Thus, the Court is obliged to conclude that "network" must be construed as a communication system for the transmission of information, across which travels information that may be individually addressed to generators or devices intended for the monitoring and control of those generators.

### 2.1.1.1.4 "Load"

Kohler argues that the term "load" should be defined as "power output (as of a power plant) or power consumption (as by a device)." (Kohler Br. in Supp. at 10). Generac argues that "load" should be construed only as a device that consumes power, as opposed to also including power-output devices, and specifically argues that "load" should not be construed to include a utility. (Generac Resp. at 10–11).

On the definition of "load," the Court agrees with Generac. Again, "load" is a term of art, and therefore the Court should first examine the patent to determine whether load is defined therein. *See, e.g.*, *Johnson*, 415 F.3d at 1314, 1317, 1324; *Vitronics Corp.*, 90 F.3d at 1582. The patent's language

explicitly states that "[d]uring a commercial power outage, it is often necessary for a consumer to continue supplying electrical power to a load," "a single generator may not generate enough electrical power to meet the demands of the load," and "multiple electrical generator are often needed to provide sufficient electrical power for the load connected thereto." (U.S. Patent No. 6,653,821, at 1:19–27). This language clearly contemplates the term "load" to mean some form of device that *receives* (as opposed to *provides*) electrical power from the generators.

Therefore, the Court is obliged to construe "load" to mean "a device that consumes electrical power for its operation."

### 2.1.1.2    Second Process Element of Claim 19

The Court now turns to the second process element of Claim 19, which provides for "selecting each generator set and setting various predetermined operating parameters for each selected generator set." The parties disagree over the meaning of the terms "selecting each generator set" and "predetermined operating parameters," as they are used in this process element.

### 2.1.1.2.1    "Selecting Each Generator Set"

Generac argues that the term "selecting each generator set" requires the existence of a user interface. (Generac Resp. at 12). Kohler, on the other hand, argues that Claim 19 lacks any reference to a user interface, and therefore should not be construed to include a user interface. (Kohler Reply at 6).

The Court must again agree with Generac. It would be widely accepted that "selecting each generator set" requires some user input—the act of "selecting"—that could not be accomplished without some system for

user input; therefore, the Court must conclude that, as a simple matter of logic, Claim 19 necessarily includes a user interface. Even if the Court were to determine that this phrase were a term of art, such that the Court should look to the intrinsic evidence, *Johnson*, 415 F.3d at 1314, 1317, 1324; *Vitronics Corp.*, 90 F.3d at 1582, it would reach the same conclusion, as the prosecution history's reasons for allowance includes a "user interface for allowing a user to select" generator sets. (Aguirrechea, Notice of Allowability, May 1, 2003 (Docket #49, Ex. 44, at 705–07), at 2).

As such, the Court is obliged to conclude that "selecting each generator set" necessarily includes the existence of a user interface.

### 2.1.1.2.2 "Predetermined Operating Parameters"

Generac asserts that the term "predetermined operating parameters" must mean parameters that are adjustable to change the operation of the generator set. (Generac Resp. at 13). Kohler did not dispute this in its Reply Brief (Kohler Reply at 4–6), and the Court does not believe Kohler could reasonably have done so. A parameter is "[a]ny distinguishing or defining characteristic," OXFORD ENGLISH DICTIONARY, Online (September 2012), and thus an "operating parameter" must be defined as a "distinguishing or defining characteristic as related to the operation of a system."

That definition is practically synonymous with the construction urged by Generac, which the Court will now adopt: "a parameter that when varied changes the operation of the system."

### 2.1.1.3 Third Process Element of Claim 19

The only potentially-disputed term in Claim 19 is "predetermined operating parameters," which the Court has already construed above to mean "a parameter that when varied changes the operation of the system."

Having now completed its construction of Claim 19 and for ease of reference, the Court provides the following table setting forth its final construction of each disputed term:

| CLAIM 19 | |
|---|---|
| Disputed Term | Construction |
| Plurality | More than one. |
| Generator Set | Includes an engine, a generator control, and a communications link. |
| Network | Communication system for the transmission of information, across which travels information that may be individually addressed to generators or devices intended for the monitoring and control of those generators. |
| Load | A device that consumes electrical power for its operation. |
| Selecting Each Generator Set | Implies the inclusion of a user interface. |
| Predetermined Operating Parameters | Parameters that when varied change the operation of the system. |

### 2.1.2   Claim 23

The specific terms of Claim 23, as approved by the PTO examiners, is as follows:

> A method of managing the distribution of electrical power, comprising the steps of:
>> interconnecting at least one generator set to a load and to a network, each generator set having the ability to be started and stopped;
>> selecting each generator set and setting various predetermined operating parameters for the selected generator set;

Page 14 of 44

transmitting the settings of the predetermined
operating parameters over the network to the
selected generator set;

starting the selected generator set at a first
predetermined time; and

stopping the selected generator set at a second
predetermined time.

(U.S. Patent No. 6,653,821, at 15:6–16:8).

As with Claim 19, the parties have subdivided Claim 23 into separate process elements. Claim 23 has five separate process elements, each of which the Court will address separately (despite the fact that the first three are practically identical to those found in Claim 19).

### 2.1.2.1 First Process Element of Claim 23

The first process element of Claim 23 is identical to the first process element of Claim 19, except that Claim 23 discusses the interconnection of "at least one generator set," whereas Claim 19 discusses the interconnection of a "plurality of generator sets."

#### 2.1.2.1.1 "At Least One"

Kohler argues that the term "at least one" should be construed to cover a single generator, whereas Generac argues that the Court should find that "at least one" does *not* cover a single generator, but instead means more than one. (Kohler Br. in Supp. 11–12; Generac Resp. 11; Kohler Reply 6). In support of its contention, Generac argues that the term "at least one" should be defined as "more than one," because Claim 23 provides for a generator set that is "capable of linking to one or more additional generator sets to form the interconnected system of the patent." (Generac Resp. 11 (quoting Claim 23's language requiring "interconnecting at least one generator set to a… network, each generator set…")).

Generac's argument is nonsensical. To begin, the plain language of the term "at least one," clearly means "one or more than one"—not simply "more than one" as Generac argues. If a person on the street asked another for "at least one" dollar, the second person would know that the first was requesting one dollar or more than one dollar. Similarly, here, on its plain language, the term "at least one" means one generator or more than one generator.

But, even if the Court examines Claim 23's remaining language as Generac urges, the Court cannot possibly conclude that "at least one" as used in Claim 23 means "more than one." Generac seems to argue that use of the phrase "each generator set having the ability to be started and stopped," implies the required existence of more than one generator. (Generac Resp. 11). The Court disagrees: "each" does not necessarily imply plurality, especially when compared to the facially plain language "at least one," which explicitly allows for singularity.

Moreover, the intrinsic evidence also augurs in favor of defining "at least one" to mean "one or more than one." Claim 23 explicitly uses different language than Claim 19, interchanging "at least one" for "plurality." The Court has already determined that "plurality" means more than one—and if Generac intended its language to be construed as "more than one," the Court cannot fathom why it would change its language from something that clearly means "more than one" to a phrase ("at least one") that by its clear terms means "one or more than one."

Accordingly, the Court is obliged to conclude that "at least one" means "one or more than one."

### 2.1.2.1.2    Remainder of First Process Terms

The remainder of the disputed terms ("generator set," "network," and "load") in the first process element of Claim 23 are identical to those that were disputed in the first process element of Claim 19, and the parties do not argue that their meanings differ between claims; therefore, the Court will simply apply its construction of the Claim 19 terms to their identical Claim 23 counterparts.

### 2.1.2.2 Second and Third Process Elements of Claim 23

Similarly, the disputed terms in the second and third process elements of Claim 23 ("selecting each generator set" and "predetermined operating parameters") are identical to those in the second and third process elements of Claim 19. Because the parties do not argue that the meaning of the terms differ as between Claim 19 and Claim 23, the Court will apply its construction of the Claim 19 terms to their Claim 23 counterparts.

### 2.1.2.3    Fourth and Fifth Process Elements of Claim 23

The fourth and fifth process elements of Claim 23 provide for "starting…" and "stopping the selected generator set at a… predetermined time," respectively.

Kohler argues that this language allows the user to set only a specific time at which the generator will start and stop. (Kohler Br. in Supp. at 12). Generac, on the other hand, argues that the terms should be construed to allow for setting a predetermined time *or event* (such as when utility power is lost or regained) to start and stop the generator. (Generac Resp. 13).

The Court agrees with Generac. The Court views this phrase as being one of art, and may, therefore, look to both intrinsic and extrinsic evidence to construe it. *Phillips*, 415 F.3d at 1314, 1317, 1324; *Gillette Co.*, 405 F.3d at

1370; *Innova/Pure Water, Inc.*, 381 F.3d at 1116; *Interactive Gift Express, Inc.*, 256 F.3d at 1331; *Vitronics Corp.*, 90 F.3d at 1582. The intrinsic evidence augurs in favor of a finding that Claim 23 contemplates the setting of a predetermined event, such as a power outage, to start and/or stop the generator. To begin, nothing in the patent specifically provides that "time" must refer only to a time on the clock, and not, instead, to some period of time after an event. (*See* U.S. Patent No. 6,653,8321, at 8:26–52 (allowing for setting of time periods to operate under different commands, in addition to setting of calendar days and clock times to operate)). Furthermore, the summary of the invention provides that "[d]uring a commercial power outage, it is often necessary for a consumer to continue supplying electrical power to a load," implying that the invention is designed to address that problem, such as by engaging upon the loss of power. (U.S. Patent No. 6,653,821, at 1:19–1:21). Turning to the extrinsic evidence, Generac's expert, Jaime De La Ree, Ph.D, opined that a person of ordinary skill in the art would understand the term to contemplate the ability to start and/or stop after a predetermined event. (De La Ree Decl. (Docket #49, Ex. 2), at 39–40). Kohler failed to provide any rebuttal evidence, and, therefore, the Court sides with Generac on this disputed fact.

Therefore, the Court is obliged to conclude that the fourth and fifth process elements of Claim 23 allow for setting a predetermined time *or event* upon which the generators will start or stop.

Having finished its construction of Claim 23 and for ease of reference, the Court provides the following chart setting forth its final construction of each disputed term:

| CLAIM 23 | |
|---|---|
| Disputed Term | Construction |
| At Least One | One or more than one. |
| Generator Set | Includes an engine, a generator control, and a communications link. |
| Network | Communication system for the transmission of information, across which travels information that may be individually addressed to generators or devices intended for the monitoring and control of those generators. |
| Load | A device that consumes electrical power for its operation. |
| Selecting Each Generator Set | Implies the inclusion of a user interface. |
| Predetermined Operating Parameters | Parameters that when varied change the operation of the system. |
| Starting the selected generator set at a first predetermined time | Allows for starting at a specified time or event. |
| Stopping the selected generator set at a second predetermined time | Allows for stopping at a specified time or event. |

### 2.1.3   Switchgear

Kohler argues that Generac "reads claims 19 and 23 as precluding the use of switchgear." (Kohler Reply at 2). In other words, Kohler believes that Generac understands the '821 patent to require an absence of switchgear.

Generac does no such thing. In fact, it seems Generac agrees with Kohler that the '821 patent should not be read to require an absence of

switchgear. (*See* Generac Reply (Docket #93) at 4). In its Reply Brief, Generac explicitly states that "the '821 patent actually made the new system indifferent to whether switchgear was present." (Generac Reply at 4).

The Court agrees that the '821 patent does not rely on the absence of switchgear. As Generac states, the '821 patent is indifferent to the existence of switchgear within its system. Therefore, regardless of whether a system includes switchgear, that system may infringe upon Claim 19 or Claim 23, provided that it carries out the steps in either patent claim.

The Court is obliged to conclude that the '821 patent does not require an absence of switchgear.

### 2.2 Summary Judgment Analysis

Kohler and Generac filed cross-motions for summary judgment. (Docket #40, #48). Kohler seeks summary judgment holding: (1) that both Claim 19 and Claim 23 of the '821 patent are invalid as anticipated by prior art (Kohler Br. in Supp. 6-26); and (2) that Generac cannot establish willful infringement (Kohler Br. in Supp. 26–29). Generac, meanwhile, argues for summary judgment holding: (1) that Claims 19 and 23 are not anticipated by prior art (Generac Br. in Supp. 23–30); (2) that the '821 patent is not invalid due to obviousness (Generac Br. in Supp. 19–23); and (3) that Kohler's DPS products infringe upon Claim 19 and Claim 23 (Generac Br. in Supp. 11–19).

After setting forth the summary judgment standard, the Court will first turn to the issue of anticipation, then to obviousness, and finally to infringement. This path of analysis is the most logical, since the Court need not reach the infringement issue if it determines either: (1) that prior art anticipates Claim 19 and Claim 23 of the '821 patent; or (2) that the '821 patent is invalid due to obviousness; if the Court determines either or both

cases apply, then infringement is simply not possible, because the claims and/or patent will be treated as invalid. *See* 35 U.S.C. §§ 102, 103. Further, the Court should examine anticipation before obviousness because "anticipation is the ultimate of obviousness"—that is, where there is anticipation, obviousness must follow. *In re Baxter Travenol Labs.*, 952 F.2d 388, 391 (Fed. Cir. 1991) *(*citing *In re Fracalossi,* 681 F.2d 792, 794 (CCPA 1982)).

The Court now turns to its analysis of these issues.

### 2.2.1   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

As Generac correctly points out, though, there is a different legal standard for Kohler to prevail on its invalidity claims than for Generac to prevail on its infringement claims. Indeed, invalidity must be established by clear and convincing evidence. *See, e.g.*, *Procter and Gamble Co. v. Teva Pharmaceuticals USA, Inc.*, 566 F.3d 989, 993–94 (Fed. Cir. 2009) (citing *AK Steel Corp. v. Sollac & Ugine*, 195 F.3d 1322, 1326 (Fed. Cir. 1999)); *Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (citing 35 U.S.C. § 282; *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999)). Therefore, Kohler must satisfy that heightened standard to show anticipation or obviousness,

whereas Generac need only establish infringement by a preponderance of the evidence. *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 261 F.3d 1329, 1336 (Fed. Cir. 2001) (citing *WMS Gaming, Inc.*, 184 F.3d at 1346).

2.2.2   Anticipation of the '821 Patent by Prior Art

Kohler (and TES, by extension, though for the purpose of this Order, the Court will refer to all joint arguments as emanating from Kohler) assert that the patents or products of several other entities (and even some of Generac's own) anticipated Generac's '821 patent, thus making the '821 invalid. Specifically, Kohler points to patents or products that it alleges anticipate the '821 patent: (1) U.S. Patent No. 5,734,255 (the Thompson patent); (2) U.S. Patent No. 5,323,328 (the Tanaka patent); (3) the Generator Power Control and *en*telligent software allegedly marketed by Encorp; (4) the PowerCommand system allegedly marketed by Cummins-Onan as early as 1996; and (5) the Utility 50 product allegedly marketed by Generac, itself, as early as June of 2000. (*See* Kohler Br. in Supp. at 3–7.)

Under 35 U.S.C. § 102, a patent claim is invalid if, after having been properly construed, it is determined that a single prior art reference (such as a previously-existing patent, printed publication, or invention in public use or on sale) discloses every element that the Court determined to be a part of the patent claim in question. *See, e.g.*, 35 U.S.C. §§ 102(a), (b); *Nystrom v. TREX Co.*, 424 F.3d 1136, 1149 (Fed. Cir. 2005); *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1335 (Fed. Cir. 2002); *Adv. Display Sys., Inc. v. Kent State Univ.,* 212 F.3d 1272, 1282 (Fed. Cir. 2000); *Beachcombers v. Wildewood Creative Products, Inc.*, 31 F.3d 1154, 1160 (Fed. Cir. 1994); *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1379 (Fed. Cir. 1986); *see also Nordberg Inc. v. Telsmith, Inc.*, 881 F. Supp. 1252, 1282 (E.D. Wis. 1995), *aff'd*

*sub nom. Nordberg, Inc. v. Telsmith, Inc.*, 82 F.3d 394 (Fed. Cir. 1996). However, a prior art reference need not explicitly set forth every requirement of a claim; rather, "a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing feature is necessarily present, or inherent, in the single anticipating reference." *SmithKline Beecham Corp. v. Apotex Corp.,* 403 F.3d 1331, 1343 (Fed. Cir. 2005) (quoting *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003); citing *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991), *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed. Cir. 1987)); *see also Perricone v. Medicis Pharm. Corp.,* 432 F.3d 1368, 1376 (Fed. Cir. 2005) (quoting *In re Cruciferous Sprout Litigation,* 301 F.3d 1343, 1349 (Fed. Cir. 2002), for the proposition that "[u]nder the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claims limitations, it anticipates."). Whether prior art anticipates the patent claim in question is a question of fact that must be proved by the heightened standard of clear and convincing evidence, though the Court may decide it on summary judgment in the absence of a genuine dispute of material fact. *TriMed v. Stryker Corp.*, 608 F.3d 1333, 1343 (Fed. Cir. 2010); *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343 (Fed. Cir. 2005); *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002). The burden to establish anticipation is "'especially difficult'" where, as with certain of the alleged prior art here, the alleged "infringer attempts to rely on prior art that was before the patent examiner during prosecution." *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004) (citing *Al-Site Corp. v. VSI Int'l Inc.*, 174 F.3d 1308, 1323 (Fed. Cir. 1999)).

With that legal backdrop in mind, the Court now turns to examine each of the instances of alleged prior art.

### 2.2.2.1 Thompson

The Thompson patent was issued on March 31, 1998, and covers a "Control System and Circuits for Distributed Electrical Power Generating Stations." (U.S. Patent No. 5,734,255).

At the outset, the Court notes that, because the Thompson patent was before the PTO examiners that issued the '821 patent, Kohler has an extremely tough row to hoe to establish that Thompson anticipates the '821 patent. *Glaxo Group Ltd.*, 376 F.3d at 1348 (citing *Al-Site Corp.*, 174 F.3d at 1323). Nonetheless, the Court will examine each process element of Claim 19 and Claim 23 to determine whether they are anticipated by Thompson.

The second process elements of Claim 19 and Claim 23 requires the existence of a user interface that enables the selection of a generator set and the setting of its operating parameters.

Thompson does not disclose this element. It does provide a user interface (69), partially disclosing the first requirement. (U.S. Patent No. 5,734,255, Fig. 3 (at Sheet 3); Aguirrechea, Office Action Summary, Aug. 12, 2002 (Docket #43, Ex. 2, at 116–120), at 2). However, that user interface is purely for "displaying performance parameters." (U.S. Patent No. 5,734,255, at 7:65–7:67). Kohler argues that the "user interface does not magically disappear when the display functions as a controller" (Kohler Reply at 7, n. 8), but the Thompson patent does not call for the display to function as a controller. (*See* U.S. Patent No. 5,734,255, at 7:55–7:67). Rather, the display is merely a "preferably"-included *part* of a controller; the display is connected to the controller "for displaying performance parameters of the generator

with which it is associated." The examiners must have concluded that the user interface did not allow for selection and control, given their conclusion that "the prior art…fails to teach, disclose or suggest…a user interface for allowing a user to select each of the plurality of generator sets and to set values for various predetermined operating parameters." (Aguirrechea, Notice of Allowability, May 1, 2003 (Docket #49, Ex. 44, at 705–07), at 2). Kohler has not established the ample support necessary to establish such user interface by the required clear and convincing evidence—let alone to overcome the "especially difficult" task of convincing the Court that Thompson anticipates, despite the PTO examiners' decision that it did not. *See, e.g.*, *TriMed*, 608 F.3d at 1343; *SmithKline Beecham Corp.*, 403 F.3d at 1343; *Minn. Mining & Mfg. Co.*, 303 F.3d at 1301; *Glaxo Group Ltd.*,376 F.3d at 1348 (citing *Al-Site Corp.*, 174 F.3d at 1323). Thus, the Court cannot conclude that the Thompson display/user interface allows for the selection of a generator set and setting of that generator set's operating parameters, as contemplated by the second process element of Claim 19 and Claim 23.

Accordingly, the Court is obliged to deny Kohler's motion for summary judgment that Thompson anticipates the '821 patent.

### 2.2.2.2 Tanaka

The Tanaka patent, issued on June 21, 1994, contemplates a "system for controlling power generating plant having a plurality of units in accordance with distributed computer system." (U.S. Patent No. 5,323,328 (Docket #43, Ex. 4)).

Tanaka also fails to anticipate the '821 patent. As discussed in the Court's claim construction above, the first process elements of both Claim 19 and Claim 23 require a generator set that includes a generator, an

engine, a controller, and a communications link. Tanaka's generator sets do not include each of those items; rather, as Generac points out, they do not include a communications link and their controllers are external to the generation plant. (U.S. Patent No. 5,323,328, Fig. 3 (at Sheet 3)).

Moreover, the first process elements of both Claim 19 and Claim 23 require that the generator sets be connected to a load, or a device that consumes electricity for its operation—whereas the generator sets in Tanaka are not connected to a load. Rather, Tanaka's generators are connected to a transmission line that transmits power out of the generation plant, that transmission line not consuming electricity for its operation. (U.S. Patent No. 5,323,328, Fig. 3 (Connection point 114 is a utility line)).

Thus, the Court must deny Kohler's motion for summary judgment that Tanaka anticipates the '821 patent.

### 2.2.2.3   Encorp

It is Kohler's burden to establish anticipation by clear and convincing evidence. *See, e.g.*, *Procter and Gamble Co.*, 566 F.3d at 993–94 (citing *AK Steel Corp. v. Sollac & Ugine*, 195 F.3d at 1326); *Helifix Ltd.*, 208 F.3d at 1346 (citing 35 U.S.C. § 282; *WMS Gaming Inc.*, 184 F.3d 1339). Thus, if Kohler wishes to establish anticipation through the existence of a device offered for sale, it must establish some evidence of that device's actual existence. *See, e.g.*, *Green Edge Enters., LLC v. Rubber Mulch Etc., LLC*, 620 F.3d 1287, 1298–99 (Fed. Cir. 2010); *Oney v. Ratliff*, 182 F.3d 893, 896 (Fed. Cir. 1999).

Kohler wishes to show that Encorp either described a product in a publication or sold a product more than one year before the date of Generac's patent application that would anticipate the '821 patent under 35 U.S.C. § 102(b). To do so, Kohler must establish that a "single reference [or] device"

anticipates the '821 patent. *Studiengesellschaft Kohle, m.b.H. v. Dart Industries, Inc.,* 726 F.2d 724, 727 (Fed. Cir. 1984). In other words, Kohler must show the existence of a single product or single document that clearly anticipates the '821 patent. *Id.*

Kohler has not established the existence of any Encorp product that would anticipate the '821 patent.[4] Despite extensive references to the involvement of their expert, Mr. Whitham, in the design, creation and/or supervision of Encorp products, Kohler does not establish that any such products *actually* exist. Therefore, it has not established by clear and convincing evidence any sort of anticipatory product.

Kohler has produced only two documents that could possibly establish anticipation of the '821 patent in a single reference: a line diagram illustrating a multi-generator Encorp system (Whitham Decl. (Docket #49, Ex.

---

[4]Kohler cites two cases in support of its contention that the Court should look to more than one piece of evidence to determine whether a claimed invention anticipates the '821 patent: *Woodland Trust v. Flowertree Nursery, Inc.,* 148 F.3d 1368, 1373 (Fed. Cir. 1998) and *IP Innovation LLC, et al. v. Red Hat, Inc., et al.,* No. 2:07-cv-447 (RRR), (E.D. Tex. Oct. 13, 2010). But, *Woodland Trust* seems to establish only that a court can use written documents to corroborate oral testimony—*not* that it *should* gather multiple pieces of evidence together to establish anticipation. 148 Fed 1368, 1372–73. And, while *IP Innovation* did hold that there was "no error in using multiple references to describe a single prior art system for the purpose of showing anticipation," that point of law was applied where there was a single device. No. 2:07-cv-447, at 9 ("Dr. Wilson used a single device, the Chan system, to show anticipation."). Here, there seems to have been multiple devices, or a "suite of products," including the Generator Power Control and *en*telligent software, all of which Encorp may have hypothesized could be used together (as in the line diagram described elsewhere in this section, but of which there is no evidence that it was actually combined and created as a product. Therefore, the Court is unable to conclude that *IP Innovation* applies to the Encorp products as urged by Kohler. *Id.*

5), Fig. 1 (at 12)) and a presentation given to the Arizona Corporation Commission (Docket #47).

Each of those references, however, fails in some way to establish anticipation of the '821 patent. The line diagram is not extremely detailed, though it certainly does seem to exhibit generator sets connected to both a load and a network (CPM). (Whitham Decl., Fig. 1 (at 12)). However, there is no evidence that a user interface exists as part of the system—though the generator sets are connected to an item labeled *en*power, it is unclear from the document what *en*power is. Moreover, whether those items would allow for starting and stopping of the generators, selection of the generator sets, or setting of operating parameters—as required to anticipate the '821 patent—is unclear from the diagram. Therefore, the Court is left to conclude that Kohler has failed to establish by clear and convincing evidence that the line diagram anticipates the '821 patent.

The presentation, meanwhile, presents a much closer call. It is unclear from the presentation whether there is a user interface that allows selection of a generator set and input of operation parameters, as required by the first process elements of Claim 19 and Claim 23. Nonetheless, Mr. Whitham opined that the presentation establishes each of those items. (Whitham Decl. 25–30). The Court determines that, as to this point, there exists a material issue of fact.

Accordingly, the Court is obliged to deny both Kohler's and Generac's motion for summary judgment as to Encorp anticipation of the '821 patent.

### 2.2.2.4 Cummins-Onan

Kohler next argues that the Cummins-Onan PowerCommand system anticipates the '821 patent. Indeed, the PowerCommand system was offered

for sale prior to June 15, 2000. (*See, e.g.*, KPFF ¶ 95 (citing Gillette Dep. (Docket #65, Ex. 89), at 349:7–19); Generac Resp. to KPFF ¶ 95 (citing Gillette Dep., at 326:10–25, but failing to dispute that PowerCommand systems were offered for sale prior to June 15, 2000)). It may therefore anticipate the '821 patent. 35 U.S.C. § 102(b).

Examining the PowerCommand documents submitted by Kohler in support of its motion for summary judgment suggesting that the PowerCommand system anticipates the '821 patent,[5] the Court must conclude that the PowerCommand system anticipates Claim 19 of the '821 patent, but that it is unclear whether the PowerCommand system anticipates Claim 23.

### 2.2.2.4.1   Claim 19

The PowerCommand system establishes all of the requirements in Claim 19. As discussed in the Court's claim construction above, Claim 19 has three separate process elements. The first of those has several separate requirements:

(1)    the interconnection of more than one

(2)    generator sets (including an engine, a generator control, and a communications link)

(3)    to a load (a device that consumes electrical power for its operation) and

---

[5]The Court finds, here, that it is proper to examine all of the documents suggested by Kohler in determining whether the PowerCommand system anticipates. Unlike the alleged Encorp system above, the PowerCommand system appears to have been an actual product with intended paralleled use. Therefore, as the *IP Innovations* court suggested was appropriate, there would be "no error in using multiple references to describe a single prior art system for the purpose of showing anticipation." 2:07-cv-447 (RRR), at 9 (E.D. Tex. Oct. 13, 2010).

(4)     to a network (a communication system for the transmission of information, across which travels information that may be individually addressed to generators or devices intended for the monitoring and control of those generators)

(5)     with each generator set having the ability to be started and stopped.

The second process element also has multiple separate requirements, specifically:

(1)     selection, through a user interface, of each generator set, and

(2)     "setting various predetermined operating parameters" (parameters that when varied change the operation of the system) "for each selected generator set."

Finally, the third process element has only one requirement: transmission of the operating parameters over a network to the selected generator sets.

     The PowerCommand system meets each of these requirements. To begin, in satisfaction of the '821 patent's stated method, the PowerCommand system offers a method of managing the distribution of electrical power. The PowerCommand brochure makes clear that the system offers great control over the function of a generator set or sets. (*See* "PowerCommand Paralleling Generator Set Control" Bulletin S-1005 (Docket #44, Ex. F), at 1). Next, in satisfaction of the first element of Claim 19, the PowerCommand system contemplates:

(1)     the interconnection of more than one ("Real load sharing controls allow generator sets to share load")

(2)     generator sets, including an engine, a control, and a communications link (the following are all included in a single PowerCommand unit:

"displays status of all critical engine…functions," implying the existence of an engine; "The control system," "Smart Starting Control System"; and "optional communications over the Onan PowerCommand Communications Network," implying the existence of a communications link)

(3)     to a load ("Real load sharing controls allow generator sets to share load") and

(4)     to a network ("The PowerCommand Control includes provisions for optional communications over the Onan PowerCommand Communications Network"; "from a remote location via modem, PC and PowerCommand Network Software")

(5)     with each generator set being capable of starting and stopping ("three position switch that starts and stops the generator set locally or enables start/stop control from a remote location.").

("PowerCommand Paralleling Generator Set Control" 1/96 Bulletin S-1005, at 1–6). As to the second and third elements of Claim 19, the PowerCommand system calls for the selection of generator sets through a user interface and the setting of various predetermined operating parameters, which may then be submitted over a network. ("PowerCommand Paralleling Generator Set Control" 1/96 Bulletin S-1005, at 4 (adjustment menu allows setting of operating parameters); 6 ("network is suitable for local or remote control and monitoring functions"); Onan PowerCommand Digital Paralleling" Bulletin F-1122 7/95, at 4 ("The Powercommand's integrated platform enables monitoring and control of all paralleling system components from a remote location via modem, PC and PowerCommand Network Software" (implying user interface for control)).

With the benefit of the evidence discussed above, the Court is satisfied that Kohler has established by clear and convincing evidence that the PowerCommand system anticipates Claim 19 of the '821 patent. Therefore, the Court is obliged to grant Kohler's motion for summary judgment on that issue, and simultaneously to deny Generac's motion for summary judgment as to non-anticipation.

### 2.2.2.4.2   Claim 23

While the Court has concluded that the evidence clearly shows anticipation of Claim 19, the evidence of record is unclear as to whether all of the Claim 23 requirements are fully satisfied.

The first three process elements of Claim 23 are practically coextensive with those of Claim 19, with the exception that Claim 23 also covers a single generator set. Despite that minor difference, the Court may still conclude that each of the first three process elements of Claim 23 are anticipated by the PowerCommand system, just as the three process elements of Claim 19 were anticipated.

Claim 23 adds an additional two process elements, though, of which the Court finds that there is not ample evidence to find anticipation. Those two additional elements require the starting and stopping of a generator set at a predetermined time *or event*. The PowerCommand system contemplates the starting and stopping of generators at a predetermined time ("PowerCommand Paralleling Generator Set Control" 1/96 Bulletin S-1005, at 4 (adjustment menu allows setting of time-delayed start and stop)), but does not include any information on the ability to start and/or stop the generators at pre-specified events, such as the loss of utility power.

Accordingly, the Court must deny Kohler's motion for summary judgment of anticipation of Claim 23 by the PowerCommand system. In truth, Kohler has not even presented an issue of material fact on this question—they have not proposed any facts that would establish a PowerCommand ability to start and/or stop generators at a pre-specified event. (KPFF ¶ 107).

Therefore, on this issue, the Court is obliged to grant Generac's motion for summary judgment that PowerCommand does not anticipate Claim 23 of the '821 patent.

### 2.2.2.5 Generac

As to anticipation, Kohler's final argument is that Generac's own Utility 50 product anticipates the '821 patent. It does not.

### 2.2.2.5.1 Claim 19

The Utility 50 product, as existed prior to June 15, 2000 (which is cutoff relevant for 35 U.S.C. § 102(b) anticipation), was a single-generator-set system without the ability to expand to include additional generator sets, and it therefore cannot be deemed to anticipate Claim 19, as Claim 19 requires the interconnection of more than one generator set. (GPFF ¶ 109; De La Ree Decl. (Docket #49, Ex. 2), at 15). Kohler has not provided any evidence to dispute that fact and, therefore, the Court must deem it as not viably in dispute.

Therefore, the Court is obliged to conclude that the Utility 50 product does not anticipate Claim 19, and to grant Generac's motion for summary judgment that Utility 50 does not anticipate Claim 19. However, that grant of judgment is ultimately moot, as the Court has already determined that Cummins-Onan's PowerCommand system anticipates Claim 19.

### 2.2.2.5.2 Claim 23

Above, the Court concluded that the first process element of Claim 23 allowed for the interconnection of one or more generators to a load and to a network. Thus, there is nothing that clearly distinguishes the Utility 50 product from Claim 23. Generac's proposed facts do not establish that the Utility 50 product would not allow a single generator system to meet the entirety of process elements in Claim 23, as the Court construed them.

Accordingly, there is a question of material fact on this issue, and Generac's motion for summary judgment that Utility 50 does not anticipate Claim 23 must be denied.

### 2.2.3 Obviousness of '821 Patent

Having already determined that the Cummins-Onan PowerCommand system anticipates Claim 19, the Court need not engage in an analysis to determine whether Claim 19 is void for obviousness. *See In re Baxter Travenol Labs.*, 952 F.2d at 391 (citing *In re Fracalossi*, 681 F.2d 792, 794 (CCPA 1982)) ("anticipation is the ultimate of obviousness"). *See also In re Pearson*, 494 F.2d 1399, 1402 (C.C.P.A. 1974); *In re Kalm*, 378 F.2d 959, 962 (C.C.P.A. 1967) (lack of novelty in the claimed subject matter, such as evidence of disclosure in the prior art, is the "ultimate or epitome of obviousness").

However, having decided that none of the referenced prior art anticipates Claim 23, the Court must analyze whether it is obvious, in order to determine whether to grant Generac's motion for summary judgment of nonobviousness.

As with anticipation, defendants must establish invalidity as a result of obviousness by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, — U.S. —, 131 S. Ct.2238, 2242 (2011 (citing 35 U.S.C. § 282); *Alcon*

*Research, Ltd. v. Apotex, Inc.*, 687 F.3d 1362, 1366 (Fed. Cir. 2012). To establish obviousness, under 35 U.S.C. § 103, Kohler must show that the differences between the prior art and Claim 23 "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a); *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1374; *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012). This is a determination of law that is based on underlying determinations of fact, including "the scope and content of the prior art, the level of ordinary skill in the art, the differences between the claimed invention and the prior art, and secondary considerations of nonobviousness" (such as commercial success, long felt but unsolved needs, failure of others, etc.). *Star Scientific, Inc.*, 655 F.3d at 1374 (citing *Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l*, 618 F.3d 1294, 1300 (Fed. Cir. 2010); *KSR Int' Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007)); *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). The Court must examine each of those four factors prior to reaching a conclusion on obviousness, and must do so "without any hint of hindsight." *Star Scientific, Inc.*, 655 F.3d at 1375 (citing *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 546 (Fed. Cir. 1998); *Kinetic Concepts, Inc.*, 688 F.3d at 1360 (citing *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1375 (Fed. Cir. 2012); *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1076–77 (Fed. Cir. 2012)).

Generac argues that expert evidence is a practical requirement to succeed in establishing nonobviousness. (Generac Br. in Supp., at 20 (citing *Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1370 (Fed. Cir. 2004); *Mike's Train House, Inc. v. Broadway Ltd., Imps., LLC*, 708 F. Supp. 2d 527, 551 (D. Md.

2010))). But Generac's primary cited case, *Centricut, LLC*, does not deal with obviousness—rather, the Federal Circuit discussed the necessity of expert testimony to prove infringement, and further limited its analysis to the specific case before it. 390 F.3d at 1370. In fact, the *Centricut* court specifically noted that "[w]e do not state a per se rule that expert testimony is required to prove infringement when the art is complex." *Id.* Thus, in reality, *Centricut* has no bearing on the obviousness issue at hand. *Id.* Rather, as recited above, the Court must examine the evidence to determine whether there is evidence that could establish the obviousness of Claim 23.

The real question the Court must answer is whether Kohler, "as the party with the ultimate burden of proof on obviousness," presented evidence that could "demonstrate why it would have been obvious to combine the" prior art. *Mytee Products, Inc. v. Harris Research, Inc.*, 439 Fed. Appx. 882, 886 (Fed. Cir. 2011).[6] In *Mytee Products, Inc.*, the court held that a grant of summary judgment of nonobviousness was appropriate because the defendant's obviousness arguments were "nothing more than 'conclusory assertions, gross generalities, and unsupported assumptions made by counsel,'" and "failed to provide any reason why a person of ordinary skill would have been motivated to combine the references." *Id.*

---

[6]The Court notes, parenthetically, that Generac has cited both *Centricut, LLC*, and *Mytee Products, Inc.*, but failed to inform the Court that *Mytee Products, Inc.* specifically says that in an obviousness inquiry, the defendant was "not…necessarily required to submit expert testimony." (*Mytee Products, Inc.*, 439 Fed. Appx. at 886 (citing *Centricut, LLC*, 390 F.3d at 1369)). The Court views that omission as all but misleading: (1) Generac cited *Centricut, LLC*, for a point of law on obviousness when the case, in fact, dealt with infringement; and (2) failed to inform the Court that another cited source of law specifically counters their argument that *Centricut, LLC*, calls for submission of expert testimony in obviousness defenses.

Here, as opposed to in *Mytee Products, Inc.*, Kohler has provided ample expert testimony—even if that testimony might never reach a precise statement on obviousness. (*See generally* Whitham Decl.). Their expert witness, Christopher Whitham, provided testimony that a factfinder could determine may satisfy the four anticipation factors:

> (1)    he specifically (and extensively) discussed the state of prior art (Whitham Decl., at 7–33);
>
> (2)    he stated that a person of ordinary skill in the art for the technology of the '821 patent would have "at least a Bachelor of Science in Electrical Engineering or a closely related field and at least one to two years of experience working in the field," (GPFF ¶ 82);
>
> (3)    he discussed differences between the claimed invention and the prior art (Whitham Decl., at 7–33); and
>
> (4)    he set forth evidence of the secondary considerations of nonobviousness, such as commercial success, long felt but unresolved needs, failure of others, etc. (Whitham Decl., at 6–7, 32–33; Whitham Dep. (Docket #49, Ex. 29), at 63:11–14) and there is other evidence that shows that the '821 patent's inventor might have viewed his patent as obvious (Wedel Dep. (Docket #74, Ex. 8), at 251:2–5).

In light of this evidence, the Court agrees with Kohler that a reasonable trier of fact—namely, a jury in this case—may ultimately decide that the four above facts are present. Accordingly, summary judgment of nonobviousness is inappropriate at this juncture.

Therefore, the Court is obliged to deny Generac's motion for summary judgment of nonobviousness of Claim 23 of the '821 patent.

## 2.2.4   Infringement of '821 Patent

There is one final portion of the Court's analysis: infringement. This portion, itself, also has multiple sub-parts. To begin, Generac seeks entry of summary judgment on the issue of infringement, as to both Kohler and TES. (Generac Br. in Supp. 11–19). Therefore, the Court must analyze whether it should enter summary judgment against either of those parties, holding that they infringed upon Claim 23 of the '821 patent.[7] Furthermore, Kohler seeks entry of summary judgment holding that, even if it did infringe upon Claim 19, such infringement was not willful. (Kohler Br. in Supp. 26–29).

### 2.2.4.1   Infringement Analysis

Infringement may be either direct or indirect. *See, e.g.* 35 U.S.C. § 271. To establish direct infringement, Generac must show that Kohler and/or TES actually practiced every step of Claim 23, or that another individual practiced every step thereof as the agent of or under the direct control of Kohler and/or TES. *See, e.g.*, *Akamai Tech., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1322–23 (Fed. Cir. 2012); *Linear Tech. Corp. v. ITC*, 566 F.3d 1049, 1060 (Fed. Cir. 2009); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006); *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1313 (Fed. Cir. 2003); *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993); *Mowry v. Whitney*,

---

[7]The Court having already determined that Claim 19 is invalid due to anticipation and obviousness, Kohler and TES could not have infringed upon that Claim and, therefore, the Court need not engage in an infringement analysis on Claim 19.

81 U.S. 620, 652 (1871). Induced infringement, on the other hand,[8] requires that Generac show that the defendant knowingly "cause[d], urge[d], encourage[d], or aid[ed]" another party to directly infringe upon Claim 23, with "specific intent to encourage" that infringement. *Akamai Tech., Inc.*, 692 F.3d at 1308 (quoting *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir.) (*en banc*); *Arris Grp., Inc. v. British Telecomms. PLC*, 639 F.3d 1368, 1379 n.13 (Fed. Cir. 2011)) (also citing *Global-Tech Appliances v. SEB S.A.*, — U.S. —, 131 S.Ct. 2060, 2068 (2011); *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 526 (1972); *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341 (1961); *Henry v. A.B. Dick Co.*, 224 U.S. 1, 12 (1912); *Tegal Corp. v. Tokyo Electron Co.*, 248 F.3d 1376, 1379 (Fed. Cir. 2001); *Nat'l Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1196 (Fed. Cir. 1996)).

### 2.2.4.1.1    Infringement by Kohler

There is insufficient evidence at this juncture to find that Kohler, in fact, directly infringed upon Claim 23 of the '821 patent. As stated above, proof of direct infringement necessarily requires evidence that Kohler actually carried out each of the steps of Claim 23. Here, however, there is evidence that Kohler may not have ever actually performed all of Claim 23's steps. For instance, there is testimony that Kohler has not ever interconnected generators (Stiles Dep. (Docket #74, Ex. 6), at 303:25–304:11) or that the DPS system may not have been used to transmit parameters over a network (Stiles Dep. 438:17–20; 472:13–20). Kohler does not contest that the DPS

---

[8]Contrary to Kohler's contentions, the Court finds that Generac has pled induced infringement. Generac pled infringement (against Kohler, alone) under 35 U.S.C. § 271, which, of course, includes 35 U.S.C. § 271(b)—the inducement subsection. (Compl. ¶ 19; *see also* Compl. ¶ 18 (alleging only the use, sale or offer to sell against Defendant TES)).

system is capable of performing every step of Claim 23, but disputes whether it has ever actually performed every step. (*See generally* Kohler Resp. to GPFF ¶¶ 59–81). Indeed, at this juncture, the Court agrees with Kohler that there are issues of material fact as to whether Kohler has ever performed every listed step of Claim 23. Therefore, summary judgment of direct infringement by Kohler is inappropriate.

Similarly, summary judgment finding indirect infringement would also be inappropriate. Generac has failed to point the Court to any fact that would establish that any other party has directly infringed upon Claim 23 at Kohler's behest. Accordingly, there are material issues of fact that must be resolved in order to determine whether Kohler induced another's infringement. Therefore, summary judgment of indirect infringement by Kohler is inappropriate.

For these reasons, the Court is obliged to deny Generac's motion for summary judgment of Kohler's infringement.

### 2.2.4.1.2   Infringement by TES

Just as it failed to do in regards to Kohler, Generac has failed to establish facts that TES has directly infringed upon Claim 23 of the '821 patent. As discussed above, there are disputes of fact as to whether TES ever actually performed every step of Claim 23. (*See, e.g.*, Stiles Dep., at 303:25–304:11, 438:17–20, 472:13–20).

As such, summary judgment of infringement by TES is inappropriate at this juncture, and the Court is accordingly obliged to deny Generac's motion for summary judgment on that matter.

### 2.2.4.2   Willfulness

The final prong of the Court's analysis is to determine whether Kohler is entitled to summary judgment that, in the case that it did infringe upon Generac's patent, such infringement was not willful.[9]

To establish willful infringement, Generac must show by clear and convincing evidence that Kohler acted in an objectively reckless manner and also, subjectively, that Kohler knew or should have known that its actions risked infringing upon the '821 patent. *In re Seagate Technology, LLC*, 447 F.3d 1360, 1371 (Fed. Cir. 2007) (*en banc*). In other words, if Generac has failed to produce evidence that would establish either of those prongs, then Kohler is entitled to summary judgment of nonwillfulness.

As to the first prong, objective recklessness, the inquiry turns upon "whether, given the facts and circumstances prior to [Kohler's allegedly] infringing actions, a reasonable person would have appreciated a high likelihood that acting would infringe a valid patent." *i4i Ltd. P'ship v. Microsoft Corp.*, 670 F. Supp. 2d 568, 582 (E.D. Tex. 2009), *aff'd*, *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 860 (Fed. Cir. 2010).

The Court finds that, given the prior art of record in existence at the time of Kohler's allegedly infringing actions, Kohler's position was not objectively reckless. As discussed above in its anticipation analysis, the Court found that Claim 19 is actually anticipated by the Cummins-Onan PowerCommand system, and that questions of fact exist as to whether Claim 23 is anticipated by the same. Moreover, the other prior art of record contains

---

[9]The Court notes, parenthetically, that willfulness is a statutory requirement for punitive damages. *In re Seagate Technology, LLC*, 497 F.3d 1360, 1370 (Fed. Cir. 2007) (citing *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007)).

many commonalities with Kohler's allegedly-infringing DPS system. Objectively, the Court concludes that a reasonable person would have concluded that the '821 patent may have been invalid as anticipated. Certainly, Generac has failed to establish by clear and convincing evidence that Kohler's position was objectively unreasonable.

Accordingly, the Court is obliged to grant Kohler's motion for summary judgment that its action was not willful.

3.    Conclusion

Having concluded its analysis, the Court now summarizes its holdings. Summary judgment is appropriate as to the following matters:

- The Court is obliged to grant Kohler's motion for summary judgment insofar as relates to judgment that the Cummins-Onan PowerCommand system anticipates Claim 19; and

- The Court is obliged to grant Kohler's motion for summary judgment insofar as relates to judgment that Kohler did not willfully infringe upon Generac's patents.

Furthermore, all of the Claim 19 issues (including any arguments related to anticipation, obviousness, or infringement) are now moot, as a result of the Court's finding that Cummins-Onan anticipates Claim 19.

Summary judgment is inappropriate as to the remaining issues. Accordingly the following issues of fact are "live issues" for jury trial:

- Whether the Thompson patent anticipates Claim 23 of the '821 patent;

- Whether the Tanaka patent anticipates Claim 23 of the '821 patent;

- Whether the Encorp system anticipates Claim 23 of the '821 patent;

- Whether the Cummins-Onan PowerCommand system anticipates Claim 23 of the '821 patent;

- Whether Generac's own Utility 50 device anticipates Claim 23 of the '821 patent;

- Whether Claim 23 is void for obviousness; and

- Whether Kohler did, in fact, infringe upon Claim 23 of the '821 patent.

Finally, as a housekeeping matter, the Court notes that it did not rely on the disputed supplemental declaration of John Ronza, and accordingly will deny Generac's motion to strike that declaration (Docket #98) as moot. Furthermore, the Court will not take action at this time on Kohler's motion to continue the trial date. (Docket #99). Rather, the Court will schedule a status conference with the parties to discuss that motion and this matter's trial posture. That conference will be held on Wednesday, November 28, 2012, at 8:30 A.M., and the parties may appear by phone if necessary (in such case, the parties are directed to provide the Court with a direct telephone number for all counsel that wish to participate in the conference).

Having fully addressed the parties' cross-motions for summary judgment, the Court now enters the following order.

Accordingly,

IT IS ORDERED that Kohler's Motion for Summary Judgment (Docket #40) be and the same is hereby GRANTED in part and DENIED in part, as more fully discussed above;

IT IS FURTHER ORDERED that Generac's Motion for Summary Judgment (Docket #48) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that Generac's Motion to Strike the Supplemental Declaration of John Ronza (Docket #98) be and the same is hereby DENIED as moot; and

IT IS FURTHER ORDERED that Kohler's Motion to Continue the Trial Date and Related Pretrial Deadlines (Docket #99) be and the same is hereby HELD IN ABEYANCE, pending appearance of the parties at a status conference to be held on Wednesday, November 28, 2012, at 8:30 A.M.

Dated at Milwaukee, Wisconsin, this 20th day of November, 2012.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

Page 44 of 44